## GRANT v. POWERS DRY GOODS CO.

The court will not inquire on appeal whether the evidence preponderates in favor of one party or the other, but will only consider whether there was sufficient evidence to support the verdict.

Evidence, in an action by the trustee of a bankrupt to recover a preference, **held** to show knowledge by the creditor, at the time of the transfer, of the insolvency of his debtor and an intent on the part of the debtor to prefer defendant.

Where there is no exception to any instruction nor request for other instructions by appellant, the only question for review is whether, under the instructions as given, the evidence was sufficient to justify the verdict.

On appeal from a judgment for plaintiff in an action by a trustee of a bankrupt to recover a preference, the question whether it was

necessary for plaintiff to show an intent on the part of the bankrupt to prefer defendant cannot be considered, where that question was not raised by motion to direct a verdict; neither can the objection be raised that the instructions do not submit this question, nor that there was no evidence on this point.

Judicial notice will be taken that the giving of a chattel mortgage by a merchant upon the whole of his stock of merchandise to secure a previous indebtedness is entirely out of the ordinary course of business.

On appeals from a judgment for plaintiff in an action by the trustee of a bankrupt to recover a preference, the objection that plaintiff ought not to recover because of laches in bringing this action, cannot be raised where such objection was not made in the lower court.

On appeal from a judgment for plaintiff in an action by the trustee of a bankrupt to recover money paid to a creditor as being a preference, the objection that plaintiff should not recover because of laches in bringing the action cannot be considered, where there is nothing in the record to show when the action was commenced.

In an action by the trustee of a bankrupt to recover a preference, there was evidence to show that defendant's traveling salesman had visited the place where the bankrupt was doing business and had inquired in relation to the habits of the bankrupt. **Held,** that evidence was admissible of what the bankrupt's habits were, to show what defendant would have discovered by an honest inquiry.

In an action by a trustee of a bankrupt to recover money paid a creditor as a preference, the money being raised by a chattel mortgage given a bank, it was not error to refuse to admit in evidence a written order of the referee in bankruptcy which only tended to show the validity of the mortgage as between the trustee and the bank, especially where the same order had already been received in evidence without objection.

In an action by the trustee of a bankrupt to recover a preference, the bankrupt's schedules were received in evidence, and the bankrupt was asked concerning a later schedule filed showing additional indebtedness, and he testified verbally concerning the different firms to whom he was indebted and the amount of such debts without there being any order of the schedule, which he filed to correct the original schedule. **Held,** that it was not error to allow him to testify whether these creditors were such as were omitted from the first schedule, nor to allow him to state that the debts enumerated in his schedule were owing on the date when he paid defendant the amount of its indebtedness.

In an action by a trustee of a bankrupt to recover a preference, error in admitting evidence of a conversation between the bankrupt and his agent is harmless, where there was nothing in the conversation material to the case.

In an action by a trustee of a bankrupt to recover a preference, evidence of a conversation between the bankrupt and defendant's

salesman, who had been sent to the bankrupt's place of business for the special purpose of effecting a settlement with the bankrupt, is admissible.

In an action by a trustee of a bankrupt to recover a preference, evidence of what was done with a stock of goods belonging to the bankrupt which was mortgaged to raise the money paid defendant is admissible as tending to show the real value of the stock of goods and of the accounts.

(Opinion filed, May 7, 1909.)

Appeal from Circuit Court, Roberts County. Hon. J. H. McCoy, Judge.

Action by C. H. Grant, trustee for O. O. Brantseg, a bankrupt, against the Powers Dry Goods Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Hiler H. Horton, Howard Babcock and M. Denegre, for appellant.

The general rule is that a state of facts once shown to exist is ordinarily presumed to exist until the contrary is shown, but this presumption is not retroactive. Lawson on Presump,. p. 238; Martyn v. Curtis, 67 Vt. 263. One can be adjudged a bankrupt under the Bankruptcy Act and yet not be insolvent. West Company v. Lee, 174 U. S. 590. Notice that a debtor has not paid a claim at maturity is not necessarily and conclusively notice of insolvency under the present law. In re Eggert, 43 C. C. A. 1; Hackney v. Raymond Bros., 94 N. W. 822.

J. J. Batterton, Oscar Hallam and H. R. Horner, for respondent.

It is a general rule that the fact that such a transaction, if out of the usual course of business, is sufficient to charge the preferred creditor with notice in the premises. Mathews v. Chaboya (Cal.) 44 Pac. 169; In re Eggert, 102 Fed. 737. The giving of a chattel mortgage by a merchant on his whole stock of goods, is not in the usual course of business. In re Palmer, 3 N. B. 283; In re Coleman, 2 N. B. 562. When the chattel mortgage was given upon his whole stock and trade * * * he must have contemplated the entire breaking up of the bankrupt's business as a thing of course, whenever the pressure of other creditors who had no security, should induce the mortgagees for their own security, to take possession of the property mortgaged. Graham v. Stark, 3 N. B. R. 357. If

it appears that the debtor giving the preference was actually in-
solvent and that means of knowledge were at hand and that such
facts and circumstances were known to the creditor securing the
preference, as clearly ought to have put a prudent man upon in-
quiry, it must be held that he had reasonable cause to believe that
the debtor was insolvent, if it appears that he might have ascer-
tained the fact to be so by reasonable inquiry. Dutcher v. Wright,
94 U. S. 553; Wilson v. Bank, 17 Wall. 473.

WHITING, J. This cause comes before this court upon an
appeal from the judgment of the court in favor of the plaintiff,
and also from the order of said court refusing a new trial. The
case was tried before a jury, and the judgment rendered upon the
verdict of such jury.

This action is brought by the plaintiff, as trustee for an in-
solvent bankrupt, to recover from the defendant a sum of money
which the said plaintiff alleges that the insolvent paid to the de-
fendant a few days prior to filing petition in insolvency, and plain-
tiff claims that the bankrupt was insolvent at the time of such
payment, and that such payment amounted to an unlawful pref-
erence. One contention of the appellant is that the court erred in
not directing a verdict in favor of the defendant when plaintiff
rested his case in chief and again at the close of all evidence. Ap-
pellant contends that the evidence was insufficient to sustain the
verdict of the jury. Certain other errors are alleged which will
be hereinafter noted, but the above claims of error are the ones
entitled to the chief consideration.

The verdict of the jury having been favorable to the plaintiff
below, and the questions passed upon by said jury being pecu-
liarly questions of fact, this court will not inquire into the ques-
tion of whether the evidence preponderated in favor of the plain-
tiff or defendant, but solely whether or not there was sufficient
evidence to warrant the jury to find facts necessary for their ver-
dict. We think there was ample testimony from which the jury,
could find facts as follows: On December 10, 1901, O. O. Brant-
seg, then a merchant engaged in the general merchandise business,
paid to the defendant corporation the sum of $2,000 in full pay-
ment of indebtedness incurred for goods which said Brantseg had

purchased from time to time for some period prior to December 10, 1901. Brantseg had previously been a farmer and became engaged in the mercantile business at Sisseton in the year 1899, having as his assistant and really as the active manager of his business one Hatling, who did the buying of the goods and kept general track of the business, including the bookkeeping. While in business said Brantseg had purchased goods of the defendant, as well as of several other firms, and from time to time had rendered financial statements to the defendant company. The first statement was one dated in March, 1901, which statement on its face showed debts of about $1,850, with personal assets of $6,600, together with real estate worth $3,000 incumbered by an indebtedness of $1,000 other than the $1,850 indebtedness above. In August of 1901, Brantseg made another statement showing assets consisting of merchandise, $4,500, book accounts $4,000, notes $1,500 ,and other personal property $1,500, in all $11,500; with liabilities for merchandise, $2,465 not due, $500 past due, loaned from friends $5,000. Outside of the above he claimed an equity in real estate of $2,500. During the fall of 1901, when requested to make payments on the account due the defendant, Brantseg was unable to meet such requests, and in October of that year the defendant company employed and sent one Leonard to Dakota for the purpose of securing or collecting this claim. Leonard was not a regular employe of the defendant company, but a person who made a specialty of adjusting and collecting claims. Leonard failed to make any collection except a very small amount, but reported Brantseg to be in apparently good condition financially. He received his information from Hatling and did not claim to have made any independent investigation. He claimed to have been advised that there was some $6,000 of debts and the net assets amounted to $5,000, besides the farm and personal property on the farm, which personal property he was advised was of the value of $2,000. Leonard learned that Brantseg was not attending to his business. Leonard also learned from Brantseg that he had given a contract for deed to the land owned by him; the selling price to be $3,000. Leonard induced Brantseg to give three notes of about $666 each in settlement of his indebtedness, said notes to

be due one each month at dates a short time in the future, and Brantseg procured an indorser for each of said notes and afterwards forwarded the same to defendant corporation. Defendant refused to receive said notes in settlement of its claim on the ground that upon investigation it found the indorsers were financially no good, but it said that it would hold the notes as collateral and did keep possession of said notes until a long time after bankruptcy proceedings were commenced.

About December 10, 1901, the defendant sent its regular credit man, one Dickerman, to attend to this claim; defendant claiming that it had contracted to sell its business to another corporation and was desirous of closing up its account. Dickerman had been advised that Brantseg was not giving his business strict attention and stated that for that reason he wanted to get additional security, but claimed to have had no direct information indicating a bad financial condition of said Brantseg; also, claimed that he at all times relied upon the reports above mentioned sent in by Brantseg and the report given by Leonard. Dickerman telegraphed for the traveling salesman, one Bateman, who sold the goods for which this indebtedness stood, to meet him at Sisseton, where Brantseg's business was. Brantseg was not in Sisseton on that date, being out in the country. When Dickerman and Bateman arrived in Sisseton, they were unable to adjust the indebtedness with Hatling. Hatling advised Dickerman that it would be impossible to pay said claim at that time. They then sent into the country for Brantseg and asked him to come to Sisseton that evening. Meanwhile Dickerman went to a bank at Sisseton, other than the one where Brantseg did his business, and such bank agreed to loan Brantseg the $2,000 necessary to pay defendant if Brantseg would secure the bank by a chattel mortgage on the stock of goods. Brantseg came into Sisseton, arriving there about 10 o'clock in the evening, and was met by Bateman and with him visited a saloon, drank one or more glasses of whisky (though not enough to intoxicate said Brantseg), and then Bateman told him what they wanted and advised him that he could get the money at the bank. Brantseg expressed a desire to see his business manager, but was prevailed upon to go direct to the bank, and while there

again expressed a desire to see Hatling before making any settlement, but was prevailed upon to give mortgage upon all of his stock of goods, such mortgage being given to the bank securing $2,000; and then Brantseg checked against said credit of $2,000 and gave Dickerman such check in full payment of defendant's claim. At that time Brantseg represented his stock as worth $5,000 to $6,000, and that he had some $3,000 in notes and accounts from which he thought he could collect the money to pay this $2,000 indebtedness to the bank. It appears that early in September Brantseg had advised the defendant company of the sale of the farm for $3,000, and that the said money had not yet been paid, and in answer to such letter the company, acknowledging it and a check which was inclosed in the letter, spoke of sending the balance of a previous order, and said it had decided to send the goods, although it would increase Brantseg's indebtedness more than it thought it should be, and further said: "However, if you have sold your farm for $3,000 and put this into your business, you will undoubtedly be able to meet the bill when due."

It does not appear that Dickerman made any inquiry whatsoever as to what had become of the proceeds from the sale of the farm, which proceeds it appears had in fact been used in paying other indebtedness. Neither does it appear that any inquiry was made regarding what had become of the $2,000 worth of personal property which Leonard states he had been advised was on the farm, and which personal property had been reported direct to the company in the August, 1901, statement, being therein mentioned as worth $1,500. The mortgage given to the bank provided that all sales of goods should be applied upon the mortgage indebtedness, that said mortgage should cover all additions to the stock, and that the mortgagee could take possession whenever it felt itself insecure. The usual sales in Brantseg's business amounted to $40 or $50 per day, although this is not shown to have been known to Dickerman. As soon as the giving of this was known, other creditors pressed Brantseg, and he gave several other mortgages on this same stock of goods, and finally, certain creditors having commenced attachment proceedings, Brantseg, on December 17, 1901, filed his petition in bankruptcy.

The evidence shows that Brantseg had been addicted to the excessive use of intoxicating liquors for some time previous to December 10th, and that some three days prior thereto he had been sent into the country for the purpose of trying to get him sobered up. He had given little or no attention to his business, leaving the same in charge of Hatling. Brantseg testified that, at the time he gave the mortgage to the bank, he did not think he had property enough to pay all his debts, and on December 17th the schedules which he filed in the bankruptcy proceedings showed secured debts secured on the stock of merchandise aggregating $3,700, nonsecured debts of about $3,500; one item of this $3,500 being one of $500 designated as the amount of debts which he was unable to itemize at the time. This schedule also showed homestead of Brantseg valued at $1,200, and notes, accounts, stock of merchandise, and other personal property aggregating $10,200. The real estate and $1,500 of the personal property was claimed as exempt. Brantseg either knew very little concerning his indebtedness, or else willfully misstated the same in the schedule filed December 17th. It appears from his sworn testimony in relation to the filing of a later schedule that, as a matter of fact, instead of there being $500 only of claims not specified in the schedule of December 17th, there was other indebtedness, due mainly to wholesale houses, running from small items up to one of $700, and aggregating in the total over $5,000, making total indebtedness of about $12,000 against assets amounting, as above stated, to a little over $10,000 besides the homestead and less than $12,000 including the homestead; and, taking out the personal property claimed as exempt, there was left, according to Brantseg's own estimate, less than $9,000 of assets not exempt. It thus appears from Brantseg's own estimates that he was hopelessly insolvent at the time of the bankruptcy proceedings. It is claimed by the appellant that this showing of assets and liabilities on December 17th was insufficient to show insolvency on December 10th, but with the other testimony given by Brantseg we think the evidence was ample to sustain a finding of insolvency on December 10th. Furthermore, there was evidence as to what sales were afterwards made from these goods and as to what the inventory

of said goods showed, which evidence would sustain a finding by the jury that said stock of goods was not worth to exceed $2,500, instead of $6,500, as stated in December 17th schedule; and there was also testimony to sustain a finding that the accounts, instead of being of the value of $3,000, were worthless.

The instructions of the court were very full, and the appellant neither excepted to any charge nor part of any charge, nor did it ask for any further instructions. It seemed to have been conceded upon the trial and by the instructions that the following were the issues in this case: (1) Was Brantseg insolvent on December 10, 1901, the date of giving the chattel mortgage and of making the payment to defendant? (2) Did the defendant or its agent at the time of such payment have reasonable cause to believe that Brantseg was insolvent? (3) Did Brantseg and defendant believe that such payment would operate as a preference? There is perhaps some question as to whether or not either party, or the court, considered the question of Brantseg's belief material; yet there are a few words in the instructions from which the jury might possibly infer that, in order to find for plaintiff, it would be necessary to find that Brantseg believed he was giving a preference when he made the payment in question. This action is based upon section 60b of the national bankruptcy law (act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), which povides: "If a bankrupt shall have given a preference within four months before the filing of a petition * * * and the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property, or its value, from such person." Section 60 of the bankruptcy law provides: "A person shall be deemed to have given a preference if, being insolvent, he has * * * made a transfer of any of his property, and the effect of. the enforcement of such transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class."

The appellant claims that there was error in the court's refusing to direct verdict when plaintiff rested his case, which mo-

tion for verdict was renewed at the close of all the evidence. An inspection of the record, however, shows that the only reason given by appellant to the court when it asked for such direction of verdict was because there was no evidence to show that defendant had any knowledge or notice of the insolvent condition of Brantseg when he made the $2,000 payment to defendant. As this feature of the case will be fully treated herein in the consideration of another claim of error, it is only necessary at this time to say that we think that there was ample evidence in the record, when plaintiff rested, to show that defendant had knowledge of facts which should have put a prudent business man or corporation upon inquiry, which inquiry would readily have revealed the insolvent condition of Brantseg.

Appellant strenuously contends that the evidence was insufficient to support the verdict because insufficient to establish any one of the three matters which were conceded to be in issue in this case, to wit, the insolvency of Brantseg, the fact that defendant had reasonable cause to believe Brantseg insolvent, and the intent on the part of Brantseg and defendant to give and to take a preference. Appellant as well as respondent have cited numerous authorities as to what the true rules of law are in cases of this class, as such rules of law apply to each of the issues in this case. It is not necessary for us at this time to determine what the true rule of law is on points wherein these cases may not appear to agree, for the reason that, as far as this case is concerned, it must stand or fall upon the law as laid down by the learned trial judge; there being, as hereinbefore mentioned, no exception to any instruction of the court nor any further instructions asked for by appellant. Therefore the only question is whether or not under the instructions as given, the evidence was sufficient to justify the verdict. We would say, in answer to the contention of appellant as raised in its additional brief, namely, that there must be shown an intent to prefer on the part of Brantseg, that, not having raised this question upon motion to direct verdict, it cannot now be considered in connection with that claim of error, and if, in construing the instructions, they were to be construed as not submitting this question to the jury, no lack of evidence on this point can now be

claimed by defendant; and, even if such instruction is subject to the construction that the jury must have found an intent to prefer on the part of Brantseg in order to find for plaintiff, we believe there was evidence from which the jury could so find for the reason, as hereinbefore noted, that Brantseg testified under oath that, when he gave the mortgage and paid this $2,000, he did not believe he had property enough to pay all his creditors in full.

There is certainly ample evidence to show that the defendant corporation considered its claim insecure. In fact, it had written complaining that the account was too large. It had tried to get payments and failed. It had tried to get good collateral and failed. It had sent a special collector, not one of its regular force, for the purpose of attempting to collect this claim. Finally, knowing that Brantseg had sold his farm, and that he had a considerable amount of personal property on said farm, the defendant sends its credit man, who had been advised that Brantseg had not been attending to his business. With this credit man was associated the regular traveling salesman, who certainly should have known that Brantseg was neglecting his business, and must have known that he was addicted to the excessive use of liquors. These parties arranged with a bank for such bank to loan money to Brantseg. This incident in itself looks suspicious, as it certainly is not in the ordinary method of business. They then get Brantseg into town and prevail upon him to give this mortgage to the bank without consulting his business manager, which mortgage covered the only property with which he could continue business. There does not appear to have been any inquiry as to what had become of the $3,000 from the farm, or as to the $1,500 or $2,000 worth of personal property.

This court will take notice of the fact that the giving of a chattel mortgage upon the whole of a stock of merchandise to secure a previous indebtedness is entirely out of the ordinary course of business. In re Eggert, 102 Fed. 737, 43 C. C. A. 1; Mathews v. Chaboya, 111 Cal. 435, 44 Pac. 169, and cases therein cited. It would seem to us that this giving and taking of a chattel mortgage was almost conclusive evidence in favor of the plaintiff in this case. A creditor might receive a payment under suspicious cir-

cumstances, and yet there not be evidence sufficient to justify finding such payment to be a preference. A creditor might receive security upon property not necessary for the carrying on of the business, such as real estate or personal property outside of the business, or even notes or accounts growing out of the business, and the giving and the receiving of the same might not be considered as strong evidence of the giving and receiving of a preference. But whenever a person engaged in the mercantile business turns over the whole of his stock in trade in payment of indebtedness to one creditor, or gives to one creditor a chattel mortgage upon all of his stock, such sale or giving of mortgage must be done with the full knowledge on the part of both parties thereto that in all probability it means the winding up of the business of the debtor. As soon as other creditors learn (as they must learn from the mortgage record, unless such mortgage is fraudulently kept from the records) that such mortgage has been given, they will insist upon security, and the inevitable result, unless the party has property so greatly in excess of the mortgage indebtedness as to give no uneasiness among the creditors, will be to cause such debtor to make an assignment or go into voluntary or involuntary bankruptcy. The defendant in the case at bar could not have contemplated anything else. It is claimed that defendant expected Brantseg to be able to realize from his accounts enough to speedily pay the bank. This contention seems very weak for the reason that, if Brantseg had had good accounts, then, from a business standpoint, the first thing a creditor would have wanted would have been an assignment of such accounts as collateral, both because they would have been more speedily realized upon, and also for the reason that it would not necessitate the closing of the debtor's business; and the mere fact that Brantseg was unable to make any payments to defendants after the sale of his farm without giving a chattel mortgage, connected with the other facts brought out in this case, leads the mind irresistibly to the conclusion that the defendant knew Brantseg was insolvent, and certainly shows a condition which should have caused its representatives to have thoroughly investigated and ascertained the true facts before it took the money derived from this chattel mortgage.

Appellant in its brief claims that this case should be reversed owing to the laches of plaintiff in bringing this action, for the reason, as defendant claims, that this action was not brought until after the time had expired within which defendant could file its claim against the bankrupt in the bankruptcy court. There is nothing to this contention both for the reason that no such position was ever taken in the lower court, and, furthermore, because there is nothing in the record to show when this action was commenced.

Appellant also claims that there was error in allowing evidence to be introduced in relation to Brantseg's habits. Such evidence surely was competent in view of the fact that defendant had its representative in the person of the traveling salesman, who visited Sisseton, and who certainly should have learned of such habits. Moreover, there is evidence on the part of the defense to show that its representative inquired in relation to the habits of Brantseg, and, if so, it surely was competent to show what he would have learned if he had made an honest inquiry.

Error is also claimed because the court excluded a written order of the referee in bankruptcy from evidence when the same was offered by the defense. There was no error in its ruling: (1) Because the order was entirely immaterial, as it would go only to show the validity of the mortgage as between the trustee and the bank; and (2) there was no error because the same order had already been received in evidence without objection.

Appellant also claims error in certain testimony of Brantseg which was admitted over objection. The schedules which Brantseg filed in bankruptcy on December 17th were received in evidence, and Brantseg was asked concerning a schedule which he filed later showing additional indebtedness not mentioned in December 17th schedule, and he testified verbally concerning the different firms to whom he was indebted and the amounts of such debts, without there being any offer whatever of the schedule which he filed to correct the original schedule. He was asked the direct question as to whether or not these creditors were the ones whose names were omitted from the first schedule. This was objected to, and the objection overruled. This evidence was clearly

competent in order to show what the total indebtedness actually was. There had been no objection to his recital in detail of who those individual creditors were and the amounts due each, and it was clearly competent for him to state that these were the unknown parties referred to in the prior schedule.

After this testimony in relation to the schedules and these additional creditors, he was asked: "Now these papers were executed on December 17, 1901. You may state, whether or not you was owing substantially all of these debts on December 10, 1901." This question was objected to. It was certainly competent as going to show insolvency at the time of the giving of the mortgage and making the payment thereunder.

Error is also claimed in allowing the testimony concerning a conversation between Hatling and Brantseg. Whether competent or not, it is immaterial, as the conversation in no way revealed anything material in this case.

Objection is also made to the receipt in evidence of a conversation between Bateman and Brantseg. This was surely competent because, as hereinbefore stated, Bateman was the salesman for defendant and had been called to Sisseton for the special purpose of assisting in effecting a settlement with Brantseg.

Error is also assigned to the receipt in evidence of testimony regarding what was done with the stock of goods after December 10, 1901, up to and including June, 1902. There was considerable of this testimony, all of which tended to assist the jury in determining the real value of the stock of goods and of the accounts, and, while it was not as satisfactory as more direct testimony would have been, yet it was the best testimony that could be procured under the circumstances of this case, and was surely competent for the consideration of the jury.

The other errors assigned do not go to matters affecting the real merits of the case and need no consideration.

For the reasons herein given, the judgment of the lower court and the order denying a new trial are affirmed.

McCOY, J., taking no part in the decision.